UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ALENA L. LAGGNER, | |
| Plaintiff, | |
| v. | Case No. 1:20-CV-166 JD |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

## OPINION AND ORDER

Plaintiff Alena Laggner appeals the denial of her claim for Supplemental Security Income. The ALJ had denied her claim after determining she was not disabled. The Court now remands the case to the Commissioner, finding that the ALJ committed reversible error by not properly analyzing Ms. Laggner's mild mental impairments when determining her residual functional capacity.

**A.     Factual Background**

In November 2016, Ms. Laggner applied for Supplemental Security Income, claiming that, by May 2013, she had become unable to work due to her health conditions. (R. 296.) In her application, Ms. Laggner primarily alleged that she was disabled due to a brain injury she experienced in 2001 and back pain. (R. 329.) At her hearing in front of the ALJ, Ms. Laggner further alleged that she was experiencing neck pain, migraines, numbness, depression, anxiety, memory difficulties, and issues with her left hand. (R. 37–39.)

On February 21, 2019, after reviewing Ms. Laggner's medical records and listening to her testimony at the hearing, the ALJ found that she was not disabled. (R. 25.) The ALJ determined that Ms. Laggner suffers from multiple severe impairments, including status post

lumbar discectomy with residual degenerative disc disease, status post cervical discectomy and fusion, degenerative disc disease of the thoracic spine, failed back syndrome, chronic pain syndrome, migraines, and obesity. (R. 17.) However, the ALJ found that Ms. Laggner's alleged problems with her hands and mental impairments were non-severe. (R. 18.) The ALJ also determined that Ms. Laggner's alleged impairment to her brain was non-medically determinable because there were no objective signs indicating the impairment. (R. 19.) The ALJ then found that none of these impairments or combination of impairments was equal in severity to the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19.) After reviewing the record and listening to Ms. Laggner at the hearing, the ALJ concluded that she had the residual functional capacity for light work as defined in 20 C.F.R § 416.967(b), except for the following limitations:

> [T]he claimant can sit five hours in an eight-hour workday; she can occasionally climb ramps and stairs; the claimant can never climb ladders, ropes and scaffolds; she can occasionally balance, stoop, kneel, crouch, and crawl; and the claimant should avoid wet, slippery, or uneven surfaces, unprotected heights, and unguarded moving machinery.

(R. 20.) Determining that Ms. Laggner could perform past relevant work as a dispatcher, the ALJ found that Ms. Laggner was not disabled. (R. 24.) Ms. Laggner requested a review by the Appeals Council, which was denied on February 21, 2020, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. See 42 U.S.C. § 405(g).

**B.     Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**C.      Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

3

months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the community.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**D.     Discussion**

Ms. Laggner argues that the ALJ's decision should be remanded for several reasons. First, she argues that the ALJ erred in finding that traumatic brain injury was not a medically determinable impairment at Step 2. (DE 30 at 18–19.) Second, she argues that the ALJ erred in attributing little weight to treating physician Dr. Edmund Haskins' opinion when calculating the RFC. (*Id.* at 19–23.) Third, she argues that her mental health impairments were not considered properly at Step 2 and in the RFC Determination. (*Id.* at 23.) Lastly, Ms. Laggner asserts that the ALJ erred in her credibility analysis. (*Id.* at 25.)

The Court disagrees with Ms. Laggner that the ALJ committed reversible error in her analysis of Ms. Laggner's traumatic brain injury. The Court also does not believe that the ALJ's analysis of Dr. Haskins' opinion is cause for remand. However, for the reasons explained below, the Court finds that the ALJ committed reversible error in her assessment of Ms. Laggner's mental health impairments. The Court does not address Ms. Laggner's final argument concerning the ALJ's credibility analysis, as it is either moot or can be addressed on remand.

*(1) Traumatic Brain Injury*

Ms. Laggner first argues that traumatic brain injury "was properly diagnosed here based on acceptable medical techniques, and should have been accounted for in the RFC and the ALJ's analysis." (DE 30 at 18.) While Ms. Laggner does not clearly indicate what determination she is challenging, it appears that she is taking issue with the ALJ's determination that traumatic brain injury was not a medically determinable impairment at Step 2. Prior to determining the RFC, the Plaintiff bears the burden of demonstrating at Step 2 that one or more medically determinable impairments are severe. *See Kinsey v. Berryhill*, No. 2:16-cv-69, 2017 WL 1101140, at *7 (N.D. Ind. Mar. 24, 2017) ("Plaintiff has the burden of proving that she has the medically determinable

5

impairment of multiple sclerosis."). Then, when determining the RFC, "the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'" *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). Additionally, an ALJ does not consider non-medically determinable impairments when determining the RFC. SSR 96-8P ("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms.").

In order to establish that her alleged traumatic brain injury was a medically determinable impairment, Ms. Laggner had to demonstrate that it resulted from abnormalities which could be shown by "medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521, 416.921. Meaning, the impairment had to be established by "objective medical evidence from an acceptable medical source." *Id.* A statement of symptoms, diagnosis, or medical opinion is not sufficient to establish the existence of an impairment. *Id.* Examples of objective evidence include "evidence of reduced joint motion, muscle spasm, sensory deficit, or motor disruption." 20 C.F.R. § 404.1529.

The ALJ determined the traumatic brain injury was not a medically determinable impairment for two reasons. First, the ALJ reasoned there was no diagnosis of traumatic brain injury by an acceptable medical source. (R. 19.) Second, the ALJ reasoned that that there was "no objective signs supporting the impairment as the imaging of her brain is unremarkable." (*Id.*) Therefore, the ALJ concluded that traumatic brain injury was a "non-medically determinable impairment." (*Id.*)

Ms. Laggner argues that neuropsychologist, Dr. Edmund Haskins, diagnosed her with traumatic brain injury and that this demonstrated a medically determinable impairment which

6

should have been considered in the RFC. (DE 30 at 19.) Ms. Laggner is correct that Dr. Haskins is an acceptable medical source. Acceptable medical sources include licensed psychologists. 20 C.F.R.§§ 404.1513(f), 404.1502. Dr. Haskins was a neuropsychologist working for the Rehabilitation Hospital of Indiana. (R. 673.) It also appears that Dr. Haskins diagnosed Ms. Laggner with traumatic brain injury. (R. 665.) However, what Ms. Laggner fails to point to is any objective evidence establishing the existence of traumatic brain injury. As mentioned above, mere diagnosis from an acceptable medical source, without objective medical evidence, is not sufficient to establish a medically determinable impairment at Step 2.[1]

The Court believes that there is substantial evidence supporting the ALJ's determination that traumatic brain injury was not a medically determinable impairment. As the ALJ notes, Ms. Laggner had CT scans of her brain conducted on multiple occasions from 2015 to 2017, but each time the imaging came back as normal. (R. 1257, 1259, 1283, 1298.) Additionally, while Dr. Haskins did perform some objective tests relating to Ms. Laggner's neurovocational functions, many of these tests also came back in the normal range. (R. 668.). For example, Ms. Laggner had a low average IQ of 86, her executive functioning was perfectly in-tact, and she was in the average range on a complex receptive language test. (R. 668–69.)

There were a few test results which came back showing moderate to severe impairment, particularly those concerning her memory and learning. (R. 668.) But, by Dr. Haskins' own admission, these results were highly unreliable. Dr. Haskins examined Ms. Laggner's motivation and effort in the context of her memory tests, and wrote that he believed the findings should be

---

[1] To the extent the ALJ erred in relying on the fact that no acceptable medical source diagnosed Ms. Laggner with traumatic brain injury, this is harmless error. Harmless error occurs when "it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support . . . ." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). The Court is confident that the ALJ would reach the same conclusion based on the lack of objective evidence in the record supporting a diagnosis of traumatic brain injury.

looked at with "extreme caution," and "may well be invalid." (*Id.*) For the other areas of testing performed, Dr. Haskins similarly discounted the results. For example, in regard to Ms. Laggner's psychosocial functioning, he wrote that the "findings are very likely to misrepresent the client's true underlying psychological difficulty and should not therefore be viewed as accurate." (R. 669.) Not only did Dr. Haskins explicitly question the validity of his own objective tests, but he also cautioned that his ultimate opinion as to Ms. Laggner's vocational barriers and strengths "needed to be viewed with extreme caution in light of the fact that it appears that Ms. Laggner was not able to do her best during the testing session." (R. 670.)  In other words, the objective tests performed by Dr. Haskins should be looked at with a healthy amount of skepticism, and perhaps discounted entirely.

      Given that Ms. Laggner had multiple CT scans of her brain performed, that each time the imaging conducted on Ms. Laggner was normal, and that Dr. Haskins wrote that the test results he received concerning Ms. Laggner's cognitive abilities could very well be invalid, the Court finds that substantial evidence supports the ALJ's determination that traumatic brain injury was not a medically determinable impairment.

      The Court also believes the ALJ adequately explained her conclusion that traumatic brain injury was not a medically determinable impairment. An ALJ must "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). This standard is "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.2008). It only requires that there be some "minimum level of analysis" so that the court can assess the validity of the ALJ's findings and provide meaningful review. *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988).  In support of her conclusion at Step 2, the ALJ explained that there were "no objective signs supporting the impairment as the imaging of her brain is

8

unremarkable." (R. 19.) Later, in determining the RFC, the ALJ also accorded Dr. Haskins' opinion little weight because the examinations they relied on, by Dr. Haskins' own admission, could very well be invalid. (R. 24.) The Court believes that these explanations by the ALJ provided the "minimum level of analysis" required.

Therefore, the Court finds no reversible error as to the ALJ's determination that traumatic brain injury was a non-medically determinable impairment.

### *(2) Dr. Haskins' Opinion*

Ms. Laggner next argues that the ALJ failed to properly weigh Dr. Haskins' opinion and, therefore, failed to properly determine her RFC. (DE 30 at 16–17.) "The Seventh Circuit has repeatedly emphasized the importance of opinions from treating sources in these proceedings." *Stephanie T. v. Saul*, No. 4:19-CV-101, 2020 WL 2316601, at *7 (N.D. Ind. May 11, 2020) (citing *Scrogham v. Colvin*, 765 F.3d 685, 696 (7th Cir. 2014)). Dr. Haskins concluded in his vocational analysis that Ms. Laggner could only work part time and would need a job "that is fairly structured with only modest demands, at least to start." (R. 873.) According to Ms. Laggner, Dr. Haskins was a treating source, and the ALJ improperly assumed the "role of psychologist" when he accorded little weight to Dr. Haskins' opinion. (DE 31 at 16–17, 21.)

For claims like Ms. Laggner's filed before March 27, 2017, a treating source's medical opinion will get controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 416.927. However, "once contrary evidence is introduced . . . a treating physician's opinion becomes just one piece of evidence for the ALJ to evaluate." *Ray v. Saul*, No. 20-2802, 2021 WL 2710377, at *2 (7th Cir. June 30, 2021) (citing *Bates v. Colvin*, 736 F.3d 1093, 1099-100 (7th Cir. 2013)).

9

The ALJ accorded Dr. Haskins' opinion little weight for three reasons. First, the ALJ noted that Dr. Haskins' examination appeared to "be largely based on the claimant's allegation of a traumatic brain injury," which was not supported by objective evidence. (R. 23.) Second, the ALJ wrote that the claimant has performed "substantial gainful activity since her alleged traumatic brain injury and that she only stopped working when she lost her job due to her company closing . . . ." (*Id.*) Third, the ALJ noted that Dr. Haskins' opinion was not supported by his examination findings, which were undercut by his own notes. (R. 24.) The Court finds that substantial evidence supported the ALJ's conclusion and that she adequately articulated her reasoning for attributing little weight to Dr. Haskin's opinion.

First, the ALJ's decision not to attribute controlling weight to Dr. Haskins' opinion was supported by substantial evidence. As mentioned above, the regulations expressly state that an ALJ is supposed to inquire into whether a treating source's opinion is based on "clinical and laboratory diagnostic techniques" when determining if their opinion is entitled controlling weight. 20 C.F.R. § 416.927. Therefore, if a treating physician's opinion is based on mere subjective reports, it is not entitled to controlling weight. *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (citing *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("And where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it."). Dr. Haskins admitted that the objective tests he performed, which examined Ms. Laggner's memory and psychosocial functions, should be viewed as either "invalid" or with "extreme caution." (R. 668, 669.) It is reasonable to conclude that a treating source's opinion is not well-supported by objective evidence when that treating source admits the tests he ran could very well be "invalid" and should be viewed with "extreme caution."

10

In support of not attributing controlling weight to Dr. Haskin's opinion, the ALJ also relied on Ms. Laggner's performance of substantial gainful activity since the time of her alleged traumatic brain injury. The daily activities of a claimant may be used to find that an expert's opinion is not entitled to controlling weight. *See Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020) (finding that an ALJ did not err in declining to attribute controlling weight to a treating source's opinion, where the ALJ partially relied on the claimant's inconsistent daily activities). The record indicates that Ms. Laggner worked as a dispatcher from 2013 to 2016, doing paperwork, reports, and occasionally driving a van. (R. 24, 323.) This activity took place far after the alleged onset of Ms. Laggner's traumatic brain injury in 2001. (R. 329.) Because Ms. Laggner's history of substantial gainful activity conflicted with Dr. Haskins' opinion, and because Dr. Haskins himself stated that his objective tests could be "invalid," the Court believes that there was no reversible error in declining to attribute controlling weight to Dr. Haskins' opinion.

The Court also finds that the ALJ did not err in attributing little weight to Dr. Haskin's opinion. After declining to attribute controlling weight, the ALJ still had to assess the proper weight to give to the opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). This requires consideration of several factors, including the length, nature, and extent of the physician and claimant's treatment relationship, whether the physician supported his or her opinions with sufficient explanations, whether the opinion is consistent with the record as a whole, and whether the physician specializes in the medical conditions at issue. 20 C.F.R. § 404.1527; *see also Keaton v. Berryhill*, No. 1:16-CV-3074-WTL-DML, 2018 WL 345087, at *3 (S.D. Ind. Jan. 10, 2018). An ALJ need not explicitly consider every factor when explaining her decision to attribute little weight to a treating physician's report. *See Henke v. Astrue*, 498 Fed. Appx. 636,

11

640 n.3 (7th Cir. 2013) (finding no error where "the ALJ did not explicitly weigh every factor while discussing her decision" to reject the expert's report, but "did note the lack of medical evidence" and "its inconsistency with the rest of the record"). However, the ALJ must still consider these factors and "minimally articulate" her reasons for discounting the treating physician's opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

The analysis explaining why the ALJ did not attribute controlling weight to Dr. Haskins' opinion similarly justifies why she gave it "little weight." First, the ALJ explained that Ms. Laggner's record of substantial gainful activity undercut the persuasiveness of Dr. Haskins' opinion. Given that Dr. Haskins examined Ms. Laggner in August of 2016 (R. 665), but that she had worked full-time as recently as 2015 (R. 323), it was reasonable to believe that her work history conflicted with Dr. Haskins' opinion that Ms. Laggner could only perform in a "fairly structured [job] with only modest demands, at least to start." (R. 671.) Furthermore, the ALJ reasoned that Dr. Haskins' explanation that his results could very well be invalid undercut his opinion. (R. 24.) Such a conclusion is entirely reasonable. In fact, where a doctor explicitly writes that his opinion should be viewed with "extreme caution" and that the objective tests underlying it may be "invalid," it would likely be unreasonable to give that opinion great weight. (R. 668, 669.) While it is clear the Ms. Laggner now wishes the ALJ afforded Dr. Haskins' opinion greater weight, the Court cannot see how the ALJ committed reversible error in attributing little weight to Dr. Haskin's opinion when Dr. Haskins repeatedly indicated that his examinations might be "invalid" and that his results should be viewed with "extreme caution." (*Id.*)

### (3) Mental Health Impairments

Next, Ms. Laggner argues that the ALJ committed reversible error by not properly

analyzing her mental health impairments. There appears to be two parts to Ms. Laggner's argument. First, she argues that the ALJ failed to properly analyze the severity of her mental impairments at Step 2. (DE 30 at 23.) Second, she argues that the ALJ did not properly consider her mental impairments when determining the RFC at Step 4. (DE 30 at 24.) The Court will analyze these issues separately.

*(a) Step 2: Severity of Mental Impairments*

Ms. Laggner asserts that the ALJ did not properly consider the severity of her mental impairments. In analyzing the severity of mental impairments at Step 2, the ALJ must use the "special technique" set forth in 20 C.F.R. § 404.1520a. This technique is "used to analyze whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations." *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). Under the special technique, the ALJ must evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant] has a medically determinable impairment." 20 C.F.R. § 404.1520a(b)(1). The ALJ must document her findings supporting this determination and then rate the degree of their functional limitation in four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(3). "These four functional areas correspond to the requirements of 'paragraph B' of the Agency's mental impairment listings." *Schmidt v. Astrue*, 496 F.3d 833, 845 n.4 (7th Cir. 2007). Degrees of functional limitation are rated by the ALJ using a five-point scale: "None, mild, moderate, marked, and extreme." 20 C.F.R. § 404.1520a(c)(4). If the ALJ rates the degree of limitation as mild, then generally they will conclude the impairment is not severe. 20 C.F.R. § 404.1520a(d)(1).

The ALJ applied the special technique to Ms. Laggner's mental impairments and found mild limitations for the first three functional areas. (R. 18–19.) The ALJ supported these findings by referring to various parts of the record, including mental status examinations with Ms. Laggner, her conduct at the hearing with the ALJ, the daily activities she engaged in, as well as reports from social security administration employees concerning interactions with her. (*Id.*) However, for the last paragraph functional area, the ALJ found that Ms. Laggner did not have a limitation in adapting or managing herself, relying on the lack of inpatient hospitalization, counseling, and the fact that her own mental health examinations revealed good insight and judgment. (R. 19.) The ALJ ultimately found that her impairments of "depressive disorder, panic disorder without agoraphobia, and anxiety, considered singly and in combination, do not cause more than a minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe." (R. 18.) Ms. Laggner raises two arguments claiming the ALJ's analysis of severity was insufficient.

First, she argues from analogy, claiming that *O'Connor-Spinner v. Colvin* is "instructive" to the instant case. 832 F.3d. 690, 697 (7th Cir. 2016). However, Ms. Laggner does not actually explain why *O'Connor-Spinner* is instructive, opting to include a lengthy block quote in lieu of legal analysis. (DE 30 at 23.) There are, in fact, critical differences between *O'Connor-Spinner* and the instant case. In *O'Connor-Spinner*, the Seventh Circuit remanded where an ALJ decided that major depression was not a "severe impairment based on the opinions of two state-agency psychologists who did not even examine, let alone treat, O'Connor-Spinner." *O'Connor-Spinner* 832 F.3d at 697. Critically, O'Connor-Spinner had been diagnosed with major depression and the Court found that the ALJ's "determination [was] not supported by substantial evidence and, indeed, strikes us as nonsensical given that the diagnosis, by definition, reflects a practitioner's

14

assessment that the patient suffers from clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* (quotation omitted). The Seventh Circuit's rationale relied on major depression being, by definition, a severe illness. *Id.* ("We have not found a published opinion from any circuit in which an ALJ declared that major depression was not a severe impairment, although two unpublished decisions soundly reject this assertion.")

Our case is simply inapposite to *O'Connor-Spinner*. Critically, the record does not show that Ms. Laggner has been diagnosed with major depression, which the Court in *O'Connor-Spinner* relied heavily on to justify its conclusion. Nor has Ms. Laggner been diagnosed with a comparable mental illness that is, by definition, severe. Additionally, the ALJ offered multiple sources in support of her conclusions, including mental status examinations conducted personally with Ms. Laggner, her conduct at the hearing, her daily activities, and her interactions with social security administration officials in support of her findings. (R. 18–19.) These stark differences undermine Ms. Laggner's argument by analogy.

Ms. Laggner also claims that the ALJ did not adequately consider Ms. Laggner's insomnia when determining the severity of her mental impairments. (DE 30 at 24.) "In rendering a decision, an ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence, but must build a logical bridge from the evidence to his conclusion." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). An ALJ must "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). This standard is "lax." *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008). It only requires that there be some "minimum level of analysis" so that the court can assess the validity of the ALJ's findings and provide meaningful review. *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988).

The Court believes that the ALJ minimally articulated why she found Ms. Laggner's mental impairments to be non-severe. It is true that in conducting her inquiry under the special technique the ALJ did not mention the symptom of insomnia. (R. 18–19.) However, in finding that the claimant's mental impairments were not severe, the ALJ mentions several exhibits in the record, including mental status examinations with physicians who considered Ms. Laggner's insomnia in reaching their conclusions. (R. 18, 682, 707, 721, 803–804.) Even though the ALJ did not explicitly mention insomnia during this inquiry, the ALJ was not required to mention every piece of evidence in order to form a logical bridge to their conclusion. Instead, the ALJ reasonably relied on medical experts who considered Ms. Laggner's insomnia when completing their mental status examinations. Therefore, the Court finds that the ALJ did not commit reversible error in their analysis of mental impairments at Step 2.

*(b) Step 4: Analysis of Mental Impairments when Determining the RFC*

Ms. Laggner next argues that the ALJ erred in analyzing her mental impairments when determining the RFC. At Step Four of the sequential analysis, the ALJ must determine the claimant's RFC. A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC must be assessed based on all the relevant evidence in the record. *Id.* "When determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'" *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). If an ALJ does not "fully consider the impact of non-severe impairments," then reversal is required. *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). The reason an ALJ is required to consider even mild impairments in determining the RFC is because "even a mild impairment can put a disproportionately greater strain on a person who concurrently is suffering from a more severe affliction." *Winfield v. Commissioner of Soc. Sec.*,

No. 2:11–cv–432, 2013 WL 692408, at *4 (N.D. Ind. Feb. 25, 2013) (citing *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)).

As discussed above, the ALJ found mild limitations in three functional areas: (1) understand, remember, or apply information; (2) interact with others; and (3) persist, or maintain pace. However, despite finding these limitations, the ALJ does did not properly analyze them at Step 4 when determining Ms. Laggner's RFC. In determining the RFC, the ALJ only considered Ms. Laggner's mental impairments in one paragraph:

> The undersigned also gives great weight to the State agency psychological consultants, who opined that the claimant does not have a severe mental impairment (Ex. B4A; and B7A). This opinion is consistent with the claimant's lack of treatment, beyond medication prescribed by her primary care physician. Moreover, this opinion is supported by the claimant's lack of ongoing therapy for her mental impairments.

(R. 23.)

This analysis is flawed. When an ALJ finds a claimant has a mild mental impairment at Step 2, the ALJ cannot merely repeat that earlier conclusion at Step 4. Rather, the ALJ must "explicitly discuss the Plaintiff's mild restrictions" and "analyze their impact on the Plaintiff's ability to engage in substantial gainful activity." *Verlee v. Astrue*, No. 1:12-CV-45, 2013 WL 1760810, at *9 (N.D. Ind. Apr. 24, 2013); *see also Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012) (reversing because the ALJ did not give any "indication that [her] RFC analysis included the mild mental limitations found at Step 2"). This analysis of mental impairments at the RFC stage cannot be skeletal, but rather "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments[.]" SSR 96-8P.

Here, the ALJ noted at Step 4 that the State agency psychological consultants concluded that Ms. Laggner's impairments were not severe. (R. 23.) But the ALJ did not analyze the three mild limitations they found earlier at Step 2 and their impact on the RFC. At the end of her step-two analysis, the ALJ did note that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (R. 19.) However, this stock language is insufficient. The ALJ must actually consider the combined impact of the impairments, even mild ones, when determining the RFC. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("[W]e have frequently reminded the agency that an ALJ must consider the combined effect of all of the claimant's impairments, even those that would not be considered severe in isolation."); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) (remanding where the ALJ similarly incorporated the special technique analysis used at Step 2 into the residual functional capacity assessment, but did not actually consider the combined impact of the impairments at Step 4).

In her response brief, the Commissioner argues that the ALJ's analysis of Ms. Laggner's mental impairments was proper. (DE 36 at 4–7.) The Commissioner explains how the ALJ used the special technique at Step 2 to conclude that Ms. Laggner had only mild mental impairments. (*Id.*) The Commissioner also explains how the ALJ, when determining the RFC, considered opinions of two psychological consultants who opined she had no more than mild limitations. (*Id.*) However, the Commissioner does not acknowledge the ALJ's failure to actually analyze the impact of Ms. Laggner's mild mental limitations on her RFC. A post-hoc rationalization that ignores the deficiencies of an ALJ's decision is not a sufficient defense. *See Hardy v. Berryhill*, 907 F.3d 309, 313 (7th Cir. 2018) ("ALJ's decision cannot be defended on a basis not articulated in her order."); *see also Jayson J. v. Saul*, No. 2:19CV175, 2020 WL 597657, at *12 (N.D. Ind.

Feb. 7, 2020) ("The Commissioner's attempt to draw the line between the ALJ's evaluation of Plaintiff's symptoms . . . and the ALJ's RFC findings is impermissible post-hoc rationalization of the ALJ's decision.")

"A failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). This includes non-severe mental impairments. *See Alesia v. Astrue*, 789 F. Supp. 2d 921, 934 (N.D. Ill. 2011). Therefore, remand is warranted. On remand, the ALJ must redetermine the RFC, paying particularly close attention to their earlier findings of mild limitations at Step 2.

**E.     Conclusion**

On the basis of the foregoing, the Court **REVERSES** the Commissioner's decision and **REMANDS** this matter to the Commissioner for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: November 2, 2021

                                                        /s/ JON E. DEGUILIO
                                              Chief Judge
                                              United States District Court